```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      UNITED STATES OF AMERICA,

 4                        Plaintiff,          Case No. 22-30053
          -v-
 5
        WAHID MOHAMED MAKKI,
 6
                          Defendant.
 7      _____/
        AND
 8
        UNITED STATES OF AMERICA,
 9                                            Case No. 22-30141
                          Plaintiff,
10        -v-

11      ZEINAB MAKKI,
                          Defendant.
12      _____/

13                       DETENTION HEARING

14             BEFORE THE HONORABLE ANTHONY P. PATTI
                   United States Magistrate Judge
15            Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
16                     Detroit, Michigan
                       March 23, 2022
17
        APPEARANCES:
18      FOR THE PLAINTIFF:    PHILIP A. ROSS
                              U.S. Attorney's Office
19                            211 W. Fort Street, Suite 2001
                              Detroit, MI 48226
20
        FOR THE DEFENDANT:    WILLIAM W. SWOR
21      (Wahid Makki)         500 Griswold Street, Suite 2450
                              Detroit, MI 48226
22
                              MICHAEL A. RATAJ
23      (Zeinab Makki)        500 Griswold Street, Suite 2450
                              Detroit MI 48226-3421
24      TRANSCRIBED BY:
        Christin E. Russell, FCRR, RDR, CRR, CSR-5607
25      (248) 420-2720
        Proceedings digitally recorded.
```

TABLE OF CONTENTS

Detention Hearing                                        Page

Proffer and Argument by Mr. Ross                         4
Proffer and Argument by Mr. Swor                         23
Proffer and Argument by Mr. Rataj                        34
Rebuttal by Mr. Ross                                     37

Ruling of the Court                                      42

CERTIFICATE OF REPORTER                                  63

```
 1  Detroit, Michigan

 2  March 23, 2022

 3  2:48 p.m.

 4                      *      *      *

 5          THE CLERK:  The Court calls cases 22-30053, United

 6  States of America vs. Wahid Makki, and Case No. 22-30141,

 7  United States of America vs. Zeinab Makki.

 8          MR. ROSS:  For the record, Philip Ross appearing on

 9  behalf of the United States.  Good afternoon, your Honor.

10          THE COURT:  Good afternoon.

11          MR. SWOR:  Good afternoon, your Honor.  William Swor

12  on behalf of Wahid Makki.  And this afternoon, not only have I

13  brought a tie, I brought Mr. Mike -- Mr. Rataj with me to make

14  this a very clean hearing.  Mr. Rataj is going to appear, at

15  least for this afternoon, on behalf of Zeinab Makki.

16          THE COURT:  Okay.  Great.  And you both have great

17  ties, as do you, Mr. Roth. [Sic]

18          MR. ROSS:  Thank you.

19          THE COURT:  Okay.  We have that established.

20          And your clients are both here?

21          MR. SWOR:  They are both here, your Honor.

22          MR. RATAJ:  Yes, your Honor.

23          THE COURT:  All right.  I can see both of them.

24          MR. RATAJ:  She's right here, your Honor.

25          THE COURT:  Okay.  All right.  Very well.  So what
```

1    we'll do is, I imagine part of the prosecutor's presentation
2    will be joint facts that are being proffered for both, and then
3    I'm going to ask him to split it off individually.  And then
4    what I'll do is I'll stop and I'll have each of the attorneys
5    make proffers, and then I'll go to argument.  You'll be a
6    little -- usually I keep them all together, but I think we'll
7    then deal with them and argument, rule separately.  Okay?
8              MR. ROSS:  Thank you, your Honor.
9              At the outset, I think the way the Government intends
10   to proceed is with the health care fraud complaint.  It seems
11   prudent to start it that way, because both Zeinab Makki and
12   Wahid Makki are affiliated with the two pharmacies at issue.
13   In Zeinab Makki's criminal complaint the charge is health care
14   fraud, New Millennium Pharmacy in Inkster, also Western wayne
15   Pharmacy located in Inkster as well.
16             Ms. Makki, Zeinab Makki, is a licensed pharmacist.
17   Her name appears on the Medicare provider enrollment
18   agreements.  She agrees not to knowingly submit false and
19   fraudulent claims to the Medicare program.  And her husband,
20   Wahid, is listed as an owner of the two respective pharmacies
21   on the data obtained from the Michigan Secretary of State, the
22   corporation documents, things of that nature.  The bank records
23   also reflect that both Zeinab Makki and Wahid Makki controlled
24   bank accounts into which the fraud proceeds were distributed.
25             At the outset of health care fraud scheme, the

1   Government's theory is that Zeinab Makki submitted claims for

2   pharmaceuticals not dispensed; that she submitted claims for

3   deceased beneficiaries; that she submitted claims for

4   pharmaceuticals by billing for larger quantities than were

5   dispensed; and that the proceeds, excuse me, she also dispensed

6   pharmaceuticals without a legitimate prescription; and finally

7   that the purpose of the scheme was to divert the proceeds.

8           I'd like to start with a little bit of a historical

9   lesson in this case.  The Government brought it up yesterday,

10  but Zeinab and Wahid Makki in 2011 entered into a civil

11  settlement for violating the Controlled Substances Act at New

12  Millennium Pharmacy.  Zeinab and Wahid Makki agreed jointly to

13  pay the United States Attorney's Office $200,000.  They denied

14  criminal liability in the settlement agreement that I

15  referenced as Exhibit 8 -- I'm going to go a little bit out of

16  order in terms of the exhibits.

17          MR. SWOR:  I'm sorry.  Exhibit what?

18          MR. ROSS:  Eight, the settlement agreement.

19          MR. RATAJ:  We don't have that.  I don't have that.

20          MR. SWOR:  No.

21          MR. ROSS:  I e-mailed a copy, but I'd be happy to

22  provide another one.

23          On page 2 --

24          THE COURT:  This was part of a diversion or what?

25          MR. ROSS:  Yes.  This is part of a drug diversion

1    violation under the Controlled Substances Act that provides for
2    both criminal liability and civil liability.
3              THE COURT:  Okay.
4              MR. ROSS:  So our office brought an indictment against
5    two pharmacists who were working at New Millennium at the same
6    time Zeinab Makki was the pharmacist in charge.
7              On page 2 of this settlement agreement, Zeinab Makki
8    agreed that between the time period of 2005, August, April and
9    September of 2005, she was acting as a pharmacist and she
10   dispensed 216 prescriptions for controlled substances issued by
11   a physician when Millennium knew or was deliberately ignorant
12   in failing to know that the prescriptions were not issued for a
13   legitimate purpose, medical purpose or in the usual course of
14   professional treatment.
15             There are several recitations, but the long and short
16   of it is Wahid and Zeinab Makki early on found a way to make a
17   payment to the Government and continue operating pharmacies,
18   despite having violated the Controlled Substances Act.  Later
19   in 2014, Zeinab Makki paid the State of Michigan $317,000 to
20   repay for pharmaceuticals that she had not dispensed.
21             THE COURT:  When was that?
22             MR. ROSS:  That was in 2014.  And the lingo that the
23   law enforcement, the agency uses in discussing this type of
24   scheme is a shortage scheme.  So effectively the pharmacist is
25   billing the insurer, in this case, Medicare, Medicaid, for

1  pharmaceuticals they don't actually purchase, which means they

2  can't actually dispense the pharmaceuticals that they are

3  claiming that they've purchased.  And I can explain a little

4  bit about how the Government investigation proceeded.

5      The federal government opened its investigation of

6  Zeinab Makki and Wahid Makki's pharmacists most recently in

7  2019.  And again, as I mentioned, the provider agreements with

8  Medicare illustrate that Zeinab Makki is the pharmacist in

9  charge.  Her husband is not a pharmacist.

10      And we also obtained unemployment information from the

11  State Unemployment Agency indicating that for most of the time

12  working there, Zeinab Makki was the only pharmacist employed by

13  New Millennium Pharmaceuticals and Western Wayne

14  Pharmaceuticals during the pertinent period.

15      The Department of Health and Human Services then

16  obtained from the pharmaceutical wholesalers the invoice

17  records pertaining to New Millennium and Western Wayne

18  Pharmaceuticals.  So they go to McKesson, they go to those kind

19  of companies that sell to pharmacies wholesale in bulk.  They

20  take the invoice records that pertain to Western Wayne and to

21  New Millennium and they send those records to a Medicare

22  contractor.  The Medicare contractor then takes the invoice

23  records attained pertinent to New Millennium and Western Wayne,

24  and they compared them against the actual claims submitted.

25      So the way it works is that a pharmacist attempts to

```
 1    fill a prescription using the electronic software, and when
 2    that prescription is entered into the computer, the claim is
 3    generated to the insurer, to Medicare and to Medicaid.
 4         The invoice review performed by the Medicare
 5    contractor found that Western Wayne and New Millennium had
 6    billed the Medicare program and Medicaid program for
 7    approximately $10.6 million in pharmaceuticals that they didn't
 8    actually purchase.  And I think the dollar figure here, I need
 9    to say something about it, because often the Government will
10    allege in health care schemes an amount billed by a certain
11    medical provider, that the amount the provider obtains is
12    generally often substantially less.  In this case, the loss
13    here is actually $10.6 million once we compared the invoice
14    records against the Medicare claim data.
15         The Department of Health and Human Services and the
16    FBI also had an opportunity to talk to their colleagues with
17    the State of Michigan that also has responsibility for policing
18    the Medicaid program.  And the Medicaid investigation, is
19    actually referenced in Zeinab Makki's criminal complaint.
20         And one of the pictures, which is located on page 14
21    of the complaint, is a picture of labels that were generated
22    when Zeinab Makki entered in prescriptions to be filled.  And
23    what the State found important about the fact that these labels
24    were sitting around and they were in a stack, was that Zeinab
25    Makki had generated these labels and caused a claim to be filed
```

1    with Medicare or Medicare, but did not actually fill those

2    prescriptions.  If she had filled those prescriptions, those

3    labels would not be in a stack.  They would be attached to

4    actual prescription bottles.

5           I would also like to direct your Honor's attention to

6    page 16 --

7           THE COURT:  Why save them?

8           MR. ROSS:  Why save them?

9           THE COURT:  Yeah.

10          MR. ROSS:  That's a good question.  The information

11   that she provided was that she wanted them for her records.

12   But as the complaint outlines, the State of Michigan believed

13   that that was a red flag, that it was not standard pharmacy

14   practice to maintain labels that were not attached to actual

15   prescriptions.

16          The second picture, which is on page 16, relates to

17   the blister pack of a pharmaceutical, the medication.  And the

18   prescription label on the blister pack references the fact that

19   there's 62 billed, and that number 62 would be the number

20   that's represented to the insurer as having been filled, but in

21   fact, closer inspection of the blister pack, and there is a red

22   arrow on the second picture on the right, indicates that there

23   are only 60 actual pills in the blister pack.

24          Next, the Department of Licensing, which is the State,

25   took an opportunity to check some of the prescriptions that

```
 1    have been filled at New Millennium by Zeinab Makki, the
 2    pharmacist.  And they took the prescriptions to the prescribing
 3    physician who was listed on the label, and that physician
 4    indicated that he had no records for several beneficiaries
 5    associated with the prescriptions that had been filled at
 6    Zeinab Makki's pharmacy.
 7            According to bank records, New Millennium received
 8    approximately, or at least $33 million in reimbursements from
 9    pharmacy benefit managers.  And so that's the intermediary that
10    pays pharmacies on behalf of Medicare for the Medicare Part D
11    program.
12            Medical -- the bank records further reflect that
13    approximately $984,000 was transferred from New Millennium into
14    personal accounts held in the name of both Zeinab and Wahid
15    Makki.
16            Bank records also show that Western Wayne
17    Pharmaceuticals received $7.7 million in reimbursements from
18    pharmacy benefit managers from July 2016 through August 2021,
19    and that those funds end up in accounts controlled by Wahid and
20    Zeinab Makki.
21            At the outset, I did note with Mr. Swor when I spoke
22    with him on the phone yesterday, and I think it's incumbent on
23    the Government to be forthright, it is our obligation to do so,
24    and I indicated to Mr. Swor that a factor that benefit --
25    benefitted his client, his clients, and that was the fact that
```

 1    a grand jury subpoena had been issued by my office, and the

 2    existence of that subpoena was disclosed to the Makkis by the

 3    mortgage company who received the grand jury subpoena.

 4            THE COURT:  When was that?

 5            MR. ROSS:  That was in December of 2020, I believe.

 6            THE COURT:  Mh-hm.

 7            MR. ROSS:  It was in December 2020, January 2021.  I

 8    was subsequently contacted by a different attorney regarding

 9    that subpoena and inquiring as to whether or not his clients

10    were under a federal investigation.  Pursuant to department

11    policy, I did not respond to that inquiry.

12            THE COURT:  But the idea is that they at least had

13    notice that they were under a federal investigation?

14            MR. ROSS:  They had notice that they were under a

15    federal investigation.  And I think if we had stopped there, we

16    might be in a different posture today.  But the reason I went

17    through the recitation of Zeinab Makki's and Wahid Makki's

18    conduct related to pharmaceuticals, either prescription drug

19    diversion or health care fraud, in 2011, they paid the Federal

20    Government, the DEA, $200,000 for violating the Controlled

21    Substances Act.  In 2014, they paid the State of Michigan more

22    than $300,000 for a pharmacy shortage scheme, which is exactly

23    what Zeinab Makki is charged with in this particular case.

24            Yesterday, during the execution of the search

25    warrants, I am told that they located a Lebanese passport for

```
1    Zeinab Makki.  I don't believe that is reflected in her
2    Pretrial Services' report, but I see is recommending release on
3    a $10,000 unsecured bond.
4              THE COURT:  Where was that located?
5              MR. ROSS:  It would be located in her house.  The
6    agents advised me they did not seize the passports.  I think
7    our argument would be it was not a document included within the
8    authority that had been issued by one of your colleagues in the
9    execution of that search warrant.
10             THE COURT:  Mh-hm.
11             MR. ROSS:  So I'm told that Lebanese passport remains
12   at their home in Kinloch, the marital home they share in
13   Dearborn Heights.
14             So next, I'd like to turn to really what concerns the
15   Government about Ms. Makki's finances.  The Government Exhibit
16   No. 1 -- I don't know if defense counsel have copies.
17             MR. SWOR:  Mh-hm.
18             MR. ROSS:  -- shows that transfers from at least two
19   accounts on which Zeinab Makki was a signatory, and one in
20   which her husband was the sole signatory transferred via wire
21   in 2018, and three separate wire transfers totalling $623,000.
22   As part of this government investigation, I asked the Federal
23   Bureau of Investigation to query whether or not either Wahid or
24   Zeinab Makki had filed what is referred to as a foreign bank
25   account report.  And it's required under the Bank Secrecy Act.
```

```
 1     Persons who have more than $10,000 in assets overseas are
 2     required to report to the IRS any asset over $10,000.  Neither
 3     Wahid nor Zeinab Makki have made any report to the Department
 4     of Treasury as is required.
 5             And I note the third wire transfer referenced on
 6     Exhibit 1 is the $1.1 million transfer from an account
 7     controlled by Wahid or Zeinab Makki to the Republic of Turkey.
 8     And in the instructions on the wire, which the Government has
 9     provided to the defense counsel and to the Court, is listed it
10     as Exhibit Number 4, the wire instructions say that the money
11     is being transferred for the purchase of a sea view condo in
12     Beirut, Lebanon.
13             My understanding from discussing Pretrial Services,
14     neither defendant has mentioned that they own property in
15     Lebanon, nor has either defendant mentioned that they have any
16     family in Lebanon, which makes the wire transfers of the
17     $623,000 all the more interesting.
18             The Government has also provided --
19             THE COURT:  Do you have information that they do have
20     relatives there?
21             MR. ROSS:  I don't.  All the information I have is
22     that they have wired approximately $1.7 million overseas, most
23     of which, all of which was destined for Beirut, Lebanon, a
24     country which your Honor referenced yesterday, we lack an
25     extradition treaty with.
```

```
 1              As part of this investigation, the Government also
 2    obtained records from the Border Patrol.  And I'm referencing
 3    now Exhibits 2 and 3, the travel for Wahid and Zeinab Makki.
 4              THE COURT:  That was Exhibit 3?
 5              MR. ROSS:  Yes, your Honor.  For Zeinab Makki, it's
 6    Exhibit 3; for Wahid Makki, it's Exhibit No. 2.
 7              These records reflect that the defendants make
 8    frequent, perhaps annual trips overseas for substantial periods
 9    of time, that I say, more than a week.  And I think that is
10    important to consider as this Court has to determine whether or
11    not these defendants are risks of flight.
12              While I'm on the topic of travel, I've also provided
13    to the Court and to defense counsel --
14              THE COURT:  We don't know final destinations from any
15    of this.  It all looks like these are transfer, transfer
16    venues, like Charles de Gualle Airport in Paris, Frankfurt,
17    Zurich, very --
18              MR. ROSS:  That's correct.
19              THE COURT:  -- very common places to switch planes.
20              MR. ROSS:  That is correct, your Honor.  I didn't mean
21    to interrupt.
22              THE COURT:  Yeah.
23              MR. ROSS:  And when persons enter the Europoean Union,
24    often that is where the records, our records begin and end.
25              THE COURT:  Right.
```

1    MR. ROSS:  At least the records to which I have

2    access.

3        While on the topic of travel, I have also provided to

4    defense counsel currency and monetary instrument reports,

5    transcripts, which are Exhibits 5, 6 and 7 related to Wahid

6    Makki.  And as the Court is likely aware, when persons leave

7    the United States with more than $10,000, they are required to

8    declare that they have those funds on them.  And in 2017, Wahid

9    Makki left the United States with approximately $19,860.  In

10   2020, Wahid Makki left the United States with approximately

11   $28,700.  And in 2021, Wahid Makki left the United States with

12   approximately $19,500.

13       I would note at the outset of my discussion of Wahid

14   Makki's conduct, that Pretrial Services is recommending that he

15   be detained pending trial.  We ask that the Court incorporate

16   that into the record when it makes its decision.  We agree with

17   Pretrial Services in that respect.  But I'd like to discuss a

18   little bit about what Mr. Wahid Makki has been doing.

19       THE COURT:  And have you -- I want to make sure I

20   didn't miss it.  Exhibit 4, have you talked about this?

21       MR. ROSS:  Exhibit 4, I think I made, I made a

22   reference to it.  This is the wire instruction that we received

23   that is related to the $1.1 million wire that Wahid Makki, or I

24   believe it is an account they both had their names on, caused

25   the transfer to go to the Republic of Turkey.  And it went from

1    Comerica Bank to Standard Chartered Bank in New York, which is
2    the correspondent bank for Comerica here.  It went, based on
3    our review of records, to the Republic of Turkey.  At the
4    bottom of the first page, it says the purpose is, "buying a sea
5    view condo," and my French isn't very good, but I believe that
6    is, "in Beirut, Lebanon."
7           The criminal complaint for which Wahid Makki appears
8    today charges him with wire fraud and money laundering.  Those
9    are both offenses carrying substantial prison sentences.
10   International money laundering, 20 years, and I believe wire
11   fraud carries the same.
12          As the complaint outlines, he took advantage, Mr.
13   Wahid Makki took advantage of a program that Congress created
14   in the wake of the COVID pandemic.  As part of the CARES Act
15   passed by Congress in March 2020 designed to provide relief to
16   businesses, the CARES Act created two different programs that
17   you might have heard about.  One was the Paycheck Protection
18   Program.  The second program was the Economic Injury Disaster
19   Loan program, referred to by the shorthand EIDL.  And as part
20   of the CARES Act, the Small Business Administration was
21   authorized to provide EIDL loans of up to $2 million to
22   eligible small businesses experiencing substantial financial
23   disruption due to the COVID-19 pandemic.  It also authorized
24   the SBA to issue advances of up to $10,000 to small businesses
25   within three days of applying for an EIDL.  The amount of

1    advance is determined by the number of the employees the

2    applicant certifies as to having.

3              As part of the application, the qualifying business

4    must submit an application about its operations.  It is

5    required to list the number of employees, gross revenues for

6    the preceding 12-month period, the disaster, the pandemic.

7    It's required to list the cost of goods it sold in the 12-month

8    period preceding disaster.  And they must also certify

9    information about the wages, and they must assure the Small

10   Business Administration that the information contained in the

11   application is true and correct to the best of their knowledge.

12             These loans, these EIDL loans are submitted directly

13   to the SBA through a government contractor called Rapid

14   Finance.  The application is approved.  Funds are then

15   advanced.  And funds that are advanced for the purposes set

16   forth by the SBA, the EIDL loan can be used for payroll

17   expenses, sick leave, production costs, business obligations

18   such as debt, rents and mortgage payments, but they cannot be

19   used to expand your business or to purchase capital assets.

20             On page 4 of the complaint and on to page 5, the agent

21   outlined the 7, 7, I think, excuse me, 10 of the 17

22   applications for EIDL loans associated with Wahid Makki.  Not

23   all of them were approved.  The chart just list simply the

24   applications that were approved.

25             Your Honor may notice at the top of this chart, the

```
 1    bottom of page 4, Wahid Makki obtained $150,000 for New
 2    Millennium Pharmacy, which presumably continued to operate
 3    during the pandemic, as most pharmacies did; provided the SBA
 4    funded a loan of $132,000 for Western Wayne.  But I would also
 5    note that there is only a six-month time period in which Wahid
 6    Makki and Zeinab Makki owned New Millennium drugs.  There's
 7    some interesting things that have occurred about the sale of
 8    that particular pharmacy, but the Government's view is they
 9    didn't own that pharmacy for the entire 12 months preceding the
10    application of the loan.
11              THE COURT:  Which is required.
12              MR. ROSS:  Which is required, yes, your Honor.
13         The agent then goes on to outline several instances in
14    which Wahid Makki made representations on the EIDL loan
15    application that are directly contradicted by the bank records.
16              New Millennium Investment 1, Wahid Makki claimed that
17    New Millennium Investment 1, LLC, had gross revenues of
18    $378,000; that it had cost of goods of $123,000, and had five
19    employees.
20              The agent went to the State of Michigan Unemployment
21    and Insurance Company, which helps us determine the number of
22    employees at a particular business and found no records
23    indicating any wages had been paid to any employees of New
24    Millennium Investment 1.
25              The agent then went onto review the business -- the
```

1  bank records obtained from Chase and Comerica under the title
2  or the company New Millennium Investment 1 for the period of
3  2019.  The total deposits to New Millennium 1 in 2019 from the
4  bank records, we see $6,500 going into the bank account for New
5  Millennium Investment 1.  We don't see the $378,000 that Wahid
6  Makki claimed he attained as part of his EIDL loan application.
7  The total of debits in 2019 for this company were $11,119 and
8  not $123,658 as reflected in the cost of goods for Wahid
9  Makki's EIDL loan application.
10        He received a $5,000 EIDL loan advance.  And
11  ultimately, the SBA then forwarded or funded another $122,000
12  loan that was deposited into an account controlled solely by
13  Wahid Makki.  After receiving the EIDL funds, he made a
14  withdrawal of $1,800 and deposited $4,500 into his Comerica
15  account.  And then he proceeded to write three checks to the
16  City of Dearborn Heights for $12,000.  No other payments were
17  made from that account after the EIDL loan was funded.  And
18  then on 2020, November 24th, 2020, he deposited $109,000 from
19  that account into New Millennium's Comerica account.  And that
20  money was part of the $1.1 million that eventually ended up
21  being wired by Comerica at his instruction to Istanbul, Turkey
22  for the purchase of the condominium in Beirut.
23        Again, on pages 8 and 9, the agent lists instances in
24  which Wahid Makki overstated the costs, or excuse me, the
25  revenues that were obtained by New Millennium Investment 4, New

```
 1    Millennium Investment 6, and the theme is consistent.
 2            Regardless of the representations he made on the EIDL
 3    loans, he is not permitted to use the proceeds of that loan
 4    that is funded by the Congress and ultimately paid for by the
 5    American taxpayers, he's not permitted to buy vacation
 6    property, he's not permitted to buy any residence.  The whole
 7    purpose of that program is to keep businesses operating.
 8            I also have some concerns about the Pretrial Services'
 9    report or what he may not have told the Pretrial Services
10    officer in his interview.
11            As I read this Pretrial Services' report, Wahid Makki
12    stated that he does not have any immediate family or cousins or
13    in-laws residing overseas.  Mr. Makki indicated that he
14    maintains contact with his family.  His wife, however,
15    indicated as I understand it, that she has a sister who resides
16    in Dubai.  Both Wahid and Zeinab Makki, as I read the reports,
17    deny having assets overseas which is perhaps completely
18    contradicted by the wire transfer of $1.1 million most
19    recently, but also the $623,000 that was sent to Beirut from
20    their bank accounts.
21            Finally, I know that Mr. Makki has a number of
22    properties.  They have a residence in Dearborn.  I believe the
23    current monetary instrument reports list his residence as a
24    Commerce Township property.  We know that there is the mortgage
25    on the Commerce Township property.  And there's a line of
```

1    credit linked to that.  But it's a property valued, as we have

2    crudely been able to place a value of it, of $1.2 million.

3         But when I read Wahid Makki's report, I was

4    interested, because this is not the most recent involvement

5    Wahid Makki has had in this courthouse.  And it's coincidental,

6    but Mr. Brand was the Pretrial Services officer for a defendant

7    named Mohamed Makki who is Wahid Makki's nephew.  I was also

8    the prosecutor who prosecuted Mohamed Makki.

9         Judge Parker released Mohamed Makki on a $200,000

10   secured bond, and that is, the Docket number for that case is

11   19-cr-20176.  That $200,000, as I understand, and Mr. Brand

12   could I believe corroborate this, that bond, that secured bond

13   was secured with a bond and a quit claim deed related to a

14   property in Dearborn, Michigan that was owned by Mohamed --

15   owned by Wahid Makki.  I don't believe that is referenced in

16   his Pretrial Services' report.  And I will circle back to the

17   e-mail I discussed in which his lawyer asked me if he was under

18   federal investigation.

19        At that time, when I received that e-mail, there was

20   simultaneously ongoing in front of Judge Parker, I filed a

21   motion to review Mohammed Makki's bond.  And Wahid Makki had

22   become concerned that Mohamed Makki was violating the terms and

23   conditions of his bond, and he may end up losing, Wahid may end

24   up losing his collateral if Mohamed Makki were to flee.

25        So all of that is to say the defendants have been

1    involved in a fraud case of staggering proportions.  It's

2    unfortunate that is not the largest health care fraud case

3    we've seen in this district.

4         THE COURT:  What's the point you want me to get from

5    the bond?

6         MR. ROSS:  That he has perhaps other real estate, the

7    secured bond with Judge Parker, he has other real estate and

8    property that is not listed in his Pretrial Services' report.

9         THE COURT:  Okay.

10         MR. ROSS:  Pretrial Services' report really is only as

11    good as the information the defendant provides.  And he says he

12    has no foreign assets, and they have to rely on the

13    verification from members of his family.

14         So given the substantial amount of money -- and I, oh,

15    and one other thing I should note, we have sought and obtained

16    one seizure warrant.  And my understanding is the bank account

17    that was related to that seizure warrant contained about

18    $29,000.  So we have sort of a big disparity in the amount of

19    money that they have obtained.  Again, I would note they have

20    obtained by our estimates approximately $10.6 million.  We've

21    seen substantial amounts of money going to Lebanon.  We have no

22    way of recovering that money at this point, and that's the

23    reason the Government is before your Honor asking for detention

24    in a fraud case.  I recognize that we don't often, well, seek

25    and/or obtain detention in fraud cases, but these defendants

```
 1   are serious risks of flight, both of them, because they have
 2   every incentive to flee.  They have the means to live abroad
 3   clearly by the wire transfer of $1.1 million overseas to Turkey
 4   and ended up buying a Lebanese property, they are ready to go.
 5   Also have failed to account why they sent $623,000 and other
 6   wires to Lebanon.
 7           We ask that the Court take all of those factors into
 8   consideration and order that the defendants be detained pending
 9   trial.
10           THE COURT:  Don't they have strong ties to this
11   community, particularly in the form of family?
12           MR. ROSS:  That's what they say.  I agree that's what
13   the Pretrial Services' report says.  And I agree they have
14   family here.
15           THE COURT:  Okay.  I mean, they have quite a few kids
16   living here, grown children, right?
17           MR. ROSS:  I'm not familiar with the number of
18   children they have.
19           THE COURT:  I guess we're going to hear about that in
20   a minute.  Okay.  Thank you.
21           And then let's, let's take them up one at a time.  I
22   guess we'll start with Wahid Makki.
23           MR. SWOR:  Good afternoon, your Honor.  William Swor
24   on behalf of Wahid Makki.
25           Mr. Makki, as the presentence report notes -- I'm
```

1    jumping ahead.  Pretrial Services' report.

2              THE COURT:  Go ahead.

3              MR. SWOR:  I'm sorry.  May I?

4              THE COURT:  Yeah.

5              MR. SWOR:  Because the issue here is whether there is

6    a serious likelihood that they would flee.  I will represent

7    and proffer to the Court that to the extent that the money

8    transferred to Turkey was transferred at the direction of the

9    building contractor based in Lebanon, and the reason it's not

10   sent to Lebanon is the banks are not functional in Lebanon.

11   Nobody is dealing with the banks in Lebanon.

12             The property referenced in this note is not yet deeded

13   to Mr. Makki.  He does not -- he has paid on it.  He does not

14   have title to it.  And even if he did have title to it, it is

15   not a place to which he could flee because it is uninhabitable.

16   It is not a built-out residence.

17             THE COURT:  Do you know what stage of construction

18   it's at?

19             MR. SWOR:  It is framed.  It is, it is structurally

20   existent.  I cannot tell you that it has plumbing or

21   electricity.  It is certainly not finished and inhabitable.

22   I've inquired several sources, and that's what I'm told.

23             I would also direct the Court to the fact that --

24   let's -- I know I'm jumping around a little bit, but as the

25   Court noted, all of Mr. Makki's family is here.  His ten

1    brothers and sisters reside here.  His four children reside

2    here.  The Lebanese passports referenced by the federal

3    government are expired and are not used by Mr. Makki for

4    travel.

5            Let me see.  He's traveled to Lebanon once a year for

6    up to four weeks and returned.  Okay.

7            THE COURT:  Does he maintain Lebanese citizenship?

8            MR. SWOR:  He's a United States citizen, your Honor.

9            THE COURT:  Right.  And I realize that you have to

10   renounce citizenship of your former country when you're

11   naturalized, but some countries don't recognize the

12   renunciation and so you maintain dual citizenship.

13           MR. SWOR:  He's a citizen of the United States.

14           THE COURT:  Right.  But do you know if he's a citizen

15   of Lebanon as well?

16           MR. SWOR:  Lebanon claims him as a citizen.

17           THE COURT:  Okay.  Thank you.

18           MR. SWOR:  I would note that Mr. Makki has met with

19   the United States Government officials.  And the Government

20   referenced in passing this, this bond that Mr. Makki posted for

21   his nephew.  And Mr. Makki and his attorney approached the

22   federal government because they were concerned that the nephew,

23   as he was required to do, the nephew was violating his

24   conditions of bond.  And Mr. Makki met with federal agents in

25   late June of 2021 before he left the United States for his

1    annual visit to Lebanon.  And he knew that he was opening up an

2    investigation because the nephew was, it appeared, was involved

3    on the purchases end on the sale of a pharmacy, a pharmacy that

4    Mr. Makki's -- one of Mr. Makki's companies was selling.

5         Mr. Makki had not been aware of that.  Originally, he

6    thought that was nephew was simply brought him a purchaser, but

7    in fact, it appeared that the nephew was violating his bond.

8    And Mr. Makki and his attorney -- and his attorney, by the way,

9    is in the courtroom here, your Honor, and available to be

10   questioned if there is, if there is a question about the bona

11   fides of Mr. Makki's concern.  Not that he was worried about

12   losing his house, but that his nephew was violating the law.

13        THE COURT:  Was he a third party custodian?

14        MR. SWOR:  I think he was just the surety.

15        THE COURT:  Where does that case stand now?  Is that

16   closed up?

17        MR. SWOR:  The case is closed and the nephew is in BOP

18   custody.  And in fact, the bond still remains in the custody of

19   this court.  And despite having been vindicated, the bond has

20   not been discharged and returned to Mr. Makki.

21        The Government says that they are concerned that that

22   means that Mr. Makki didn't disclose all of his properties to

23   the Court.  The problem is, it didn't belong to Mr. Makki.  It

24   belonged to New Millennium, LLC.  So New Millennium was the, I

25   think New Millennium is the deed holder.  Oh, Mr. Canzano says

1    he's not certain, or I'm uncertain, but Mr. Makki posted the

2    property on behalf of that.  And to the, as I said, if you want

3    Mr. Canzano is here to correct the record to clarify it.

4           But Mr. Makki knew that he would be initiating an

5    investigation.  And he went to Lebanon.  He returned to the

6    United States and he remained here.  As the Government has

7    conceded, there was additional contact with the Government, not

8    about that nephew, but a grand jury subpoena.  Mr. Makki was

9    aware of it.  His counsel was aware of it.  It was clear that

10   it was an investigation into his business practices.  He did

11   not flee the country.  He did not attempt to instruct --

12   obstruct the investigation in any way.  If, if as the

13   Government claims he was going to flee, he's had three months

14   to do it.  He didn't do it, because this is his home.  Whatever

15   he may have done, he's going to stand for it here and answer

16   here.

17          THE COURT:  You say three months.  You're referring to

18   when he became aware of the subpoena?

19          MR. SWOR:  Yes.  He knew there was an investigation

20   into New Millennium.

21          The Government kind of -- you know, when the Court

22   directly asked the Government if Mr. Makki's whole family was

23   here, the Government declined to simply say yes, but that is

24   the truth.  They reference Mrs. Makki's sister in Dubai;

25   however, they haven't see her in 12 years.  The last time they

```
 1    saw her was when she came to the United States to visit.  So
 2    there is nowhere for -- and they have no travel documents that
 3    would let them enter Dubai.
 4           You know, let me point out another thing.  These
 5    finCEN reports, financial transaction reports, these are --
 6    they are nominally voluntary, but they are required by law.
 7    But each of these reports demonstrate that when Mr. Makki left
 8    the United States to travel overseas, he accurately and
 9    honestly declared to the United States the amount of money he
10    was carrying with him.  We know that, because if it hadn't
11    been, it would have been seized and forfeited.  So these cut
12    against the Government's claim that Mr. Makki can't be trusted
13    because by three of their own documents Mr. Makki honestly
14    declared how much money he was taking.
15           Similarly, the wire transfers, they are not -- gee,
16    buying a sea view condo in Beirut, Lebanon.  He clearly was
17    stating the purpose.  Okay?  There is no, there is no attempt
18    to hide, to deceive.  Let me see.
19           They bought the house in Commerce Township because
20    they thought they might move out there.  The children got
21    older.  They are not using it except part-time.  And Mr.
22    Makki -- nobody wants to buy a property in Commerce Township
23    or, actually, I think it's Orchard Lake.  It's available.  They
24    use it.
25           THE COURT:  How old are the children?
```

```
 1            MR. SWOR:  They are all in their 20's, your Honor.
 2   Three, three of the sons are here in court today.
 3            THE COURT:  Okay.  Let me just acknowledge you.
 4   Please raise your hands.
 5            MR. SWOR:  Mohamed, Hassan and Ali.
 6            THE COURT:  All right.  Well, I'm glad you're here.
 7   It's an important event for your parents.  I can't promise how
 8   I'm going to rule.  I'm listening to all the evidence.  I'm
 9   sure they appreciate your support your love, and that means a
10   lot to them.  I often am sitting here and I look out and there
11   is nobody there for the person who is sitting where they are.
12   And so that's appreciated.
13            So three sons, all in their 20's.  And then there's a
14   daughter?
15            MR. SWOR:  There is a daughter who is a pharmacist in
16   Boston.
17            THE COURT:  Okay.
18            MR. SWOR:  So he has --
19            THE COURT:  Are their parents alive?
20            MR. SWOR:  Their parents -- Mr. Makki's parents are
21   not alive.
22            THE COURT:  Okay.
23            MR. SWOR:  His children's parents are alive.
24            THE COURT:  And do you know, or Mr. Rataj can tell us
25   if Mrs. Makki's parents are alive?
```

DETENTION HEARING - 3/23/2022

1          MR. SWOR:  Mrs. Makki's mother lives with them.  She
2    is in -- she has Alzheimer's.  She has --
3          THE COURT:  Okay.  So she lives here in the United
4    States.
5          MR. SWOR:  She lives here in the United States at the
6    Kinloch home with the Makkis.  When Ms. Makki is not working at
7    the pharmacy, she is her mother's primary caregiver.  They have
8    someone that comes in during the daytime to look after the
9    mother.
10          THE COURT:  Okay.  And her father is deceased.
11          MR. SWOR:  Her father has passed.
12          THE COURT:  Okay.  Thank you.
13          MR. SWOR:  So, your Honor, simply put, their lives,
14    and Mr. Makki's life is here.  He has nowhere else to go.
15    Okay.  The money is the money and the Government says there's a
16    lot of money.  That's fine, there is a lot of money.  But the
17    Government has not indicated, okay, 620,000 of it went over in
18    2018.  And I can represent that was toward the purchase of a
19    parcel of land, not a home, but a parcel of land in Lebanon.
20    Not money.  So none of these transfers have gone to fungible
21    assets that they could just go to Lebanon and convert to cash
22    and spend and live on.
23          If they were going to leave, they've had multiple --
24    if Mr. Makki was going to leave and escape the jurisdiction,
25    he's had multiple opportunities.  He has not done so.  This is

```
 1    his home.  This is where he lives.  He is a United States

 2    citizen.  He's been a United States citizen since 1986.

 3              And while I appreciate Pretrial Services's concern

 4    about seeing the identification of Beirut property in the

 5    complaint and not having been disclosed by Mr. Makki, but the

 6    simple fact of the matter is, is we don't have any

 7    documentation the property yet belongs to Mr. Makki.  He has no

 8    title to it at this point, and it is not inhabitable.

 9              We know his health is not particularly good.  His sons

10    have expressed some concern about his memory.  And when we had

11    conversations about the accuracy of some of this, that may be

12    attributed to that medical condition.

13              The Government has done a good job of talking about

14    its theory of the criminal complaint, but it has done nothing

15    to state to the Court why it should not believe -- they may

16    have serious fears, but they have not demonstrated by clear and

17    convincing evidence that --

18              THE COURT:  Well, they don't have to demonstrate by

19    clear and convincing evidence.  They have to demonstrate by

20    preponderance of the evidence that no condition or combination

21    of conditions can reasonably assure his appearance.

22              MR. SWOR:  And I don't think they've met that

23    standard.  The money is here.  The property is here.  His

24    family is here.  When he leaves, he leaves at a predictable

25    time and comes back at a predictable time.  He has -- his
```

```
 1   doctors are here.  He does not come and go to Lebanon.  He goes
 2   once a year.
 3            He has known about this prosecution, about this
 4   investigation.  And the Government says, well, twice before
 5   he's dealt with civil penalties.  Okay.  He dealt with civil
 6   penalties.  He dealt with the consequences of their conduct or
 7   lack of conduct.  He's no evidence of failure to appear in
 8   court.
 9            As for the Pretrial Services' suggestion that because
10   he owns a gun, he lawfully owns a gun, that he is somehow a
11   danger to the community.  He doesn't have any bullets.  Okay.
12   I think that the suggestion that he's a danger to the community
13   is not warranted.  I don't think that there is proof by a
14   preponderance of the evidence that he's a serious risk of
15   flight or that conditions could not be fashioned which would
16   reasonably assure his appearance in court.
17            THE COURT:  Yeah, they don't have to -- there's a
18   common confusion about this.  The serious risk of flight is
19   just for eligibility for a detention hearing.
20            MR. SWOR:  I understand.
21            THE COURT:  They don't have to prove serious risk of
22   flight.  They have to prove by a preponderance of the evidence
23   that no condition or combination of conditions --
24            MR. SWOR:  Yes.
25            THE COURT:  -- can reasonably assure his appearance.
```

1    Doesn't even have to flee, it's just his appearance.

2         MR. SWOR:  Right.

3         THE COURT:  But I guess what I really want to know

4    from you, because the Pretrial report for Mrs. Makki suggests

5    conditions, but yours, the Pretrial report is recommending

6    detention.  And so what, what conditions are you saying will

7    reasonably assure his appearance?

8         MR. SWOR:  Your Honor, do you want a GPS tether?  We

9    think that's appropriate.  His sons are here to act as

10   third-party custodians should the Court see the need for one.

11   His brother also volunteered to act as a third-party custodian.

12   And I dare say that each and every one of his ten siblings

13   would do so as well.  He works out of his home.  The Court

14   could fashion a curfew or at least require that he notify

15   Pretrial Services.  If the Court wants frequent reporting, it

16   could have that.  All of those conditions are available to the

17   Court and would reasonably assure his appearance.

18        THE COURT:  One of the concerns clearly that the

19   Government has is that, and we've just talked about it a minute

20   ago --

21        MR. SWOR:  Yes.

22        THE COURT:  -- is that because of the fact that

23   Lebanon claims him as a citizen, he could walk into a Lebanese

24   consulate anywhere in the United States and/or these days,

25   probably electronically, obtain a new Lebanese passport that is

1    valid, and go to Lebanon permanently and not be extradited

2    because there is no extradition treaty as we heard, and that

3    would be the concern.

4         MR. SWOR:  Well, it's a concern, but there is no

5    evidence that it would happen.  Okay?  He is willing to

6    surrender his current Lebanese passport.  He's willing to be

7    bound by an obligation that he not apply for any travel

8    documents to Lebanon without advanced permission of the Court.

9    And his sons would, as third-party custodians, be obligated to

10   advise the Court if he did otherwise.  And they would agree to

11   be bound by such a condition.

12        THE COURT:  Okay.

13        MR. SWOR:  Okay.

14        THE COURT:  All right.  Anything further?  I think

15   we've gone on into argument in both cases and that's fine.

16        MR. SWOR:  Yeah.  So that's, that's it.

17        THE COURT:  Very good.  Thank you.

18        All right.  Mr. Rataj, you've been very patient.

19        MR. RATAJ:  Your Honor, I'm not going to repeat

20   everything Mr. Swor said.  I think your Honor has a good idea

21   what's going on here.  But I would underscore a couple of

22   things as it relates to Mrs. Makki in a sense that she's not a

23   risk of flight.

24        She has no family in Lebanon.  And I think the most

25   important thing, your Honor, is that all of her children are

1    here.  They are all U.S. citizens.  And your Honor has been

2    able to observe her three sons who are sitting in the courtroom

3    today.  And I think that the most important factor that, that

4    shows that she's not a flight risk, your Honor, is that her

5    mother, who has Alzheimer's disease, lives with them and she is

6    the primary caregiver.  And so this whole notion that Mrs.

7    Makki is a risk of flight really has absolutely no support.

8               THE COURT:  How old is her mother?

9               MR. RATAJ:  Eighty years old, Judge.

10              THE COURT:  Okay.

11              MR. RATAJ:  I mean, Mr. Ross has done a nice job

12    making his case, but that's not what we're here to decide

13    today.  We're here to decide the 3142 factors.  And clearly the

14    Court can fashion a combination of conditions that would

15    reasonably assure Ms. Makki's return to court.

16              And for all the reasons that Mr. Swor argued, so I'm

17    not going to repeat them all, Judge, but I think that the fact

18    that her, all of her children are here and that she is her

19    mother's primary caregiver who suffers from Alzheimer's disease

20    should be enough to convince the Court that she's not going to

21    run.

22              And quite frankly, we're prepared to fight these

23    allegations that are set forth in the criminal complaint.  And

24    she has no criminal record whatsoever.  Mr. Ross has tried to

25    take civil matters and flip them and tried to convince the

```
 1   Court that somehow there's criminality involved, but there is
 2   none.
 3           THE COURT:  I think the point he's making is that the
 4   behavior continues.
 5           MR. RATAJ:  Well, that's up for debate, Judge.  But
 6   clearly she has no criminal history at all.  So again, I'm not
 7   going to repeat everything Mr. Swor said.  I think your Honor
 8   has a full appreciation for what's going on here.
 9           And Pretrial Services, your Honor, has recommended
10   that my client receive a $10,000 unsecured bond.  And I would
11   respectfully request that your Honor follow that
12   recommendation.
13           Thank you.
14           THE COURT:  Okay.  Thank you.
15           And, Mrs. Makki, I will say my mother also suffered
16   from Alzheimer's, and that is a hard road.  And so I appreciate
17   what you're going through with her.  One of the things I
18   discovered during that time, to wax a little bit personal, is
19   that while it's tragic, it also brought out a tenderness in her
20   and a tenderness in me that I didn't know existed.  So there
21   was a -- there could be some silver lining in that cloud, so
22   okay.
23           MR. ROSS:  Your Honor, may I respond?
24           THE COURT:  Yes.
25           MR. ROSS:  I would like to start with Pretrial
```

```
 1    Services reports.  Both defendants deny owning property outside
 2    of the United States.  Mr. Swor's proffer said that his client
 3    wired the $623,000 to purchase a piece of property in Lebanon.
 4    And I have respect for Mr. Swor, having practiced with him for
 5    a number of years, and I'm not going to challenge his
 6    integrity.  He provides us no documentation of that, nor does
 7    he attempt to make any effort to address why his client
 8    disclosed -- failed to disclose the existence of that foreign
 9    asset to the Pretrial Services Department, nor did Mr. Rataj
10    address why his client said she didn't own any property outside
11    of the United States to the Pretrial Services Department.
12              MR. RATAJ:  She doesn't.
13              THE COURT:  Well, I think -- this isn't a time to
14    debate across the room.  I think his point was that his client
15    doesn't own that property; that he doesn't have title to the
16    property.  Yes, he sent the money to have this built, but like
17    is often the case, when you send money to a builder, sometimes
18    you get the deed to the property and then they build a house.
19    Sometimes you don't get the deed until the house is done,
20    right?
21              MR. ROSS:  I've never engaged in that.  I don't
22    dispute what you're saying in terms of how those things can
23    operate.  What I can say to this Court is the Government is
24    presenting the Court with information about substantial assets
25    that the defendants have moved from the United States to a
```

1          country from which it is very difficult to extricate them.

2                    I also want to bring up an individual named Naim

3          Makki, that is the brother of Wahid Makki.  And your Honor was

4          presiding duty court yesterday when you authorized the

5          execution of a search warrant in, I believe on Cherry Hill

6          Road, I believe in Dearborn, Dearborn Heights.  At that

7          location, the agents --

8                    THE COURT:  That's Mrs. Makki's brother; is that

9          right?

10                    MR. SWOR:  No.  It's Mr. Makki's brother.

11                    THE COURT:  Mr. Makki's brother.  Okay.

12                    MR. ROSS:  The agents took from -- they executed that

13          search warrant.  They took from that location two box trucks

14          full of records related to New Millennium Pharmacy.  The reason

15          I bring this up is that in addition to the grand jury subpoena,

16          the Department of Health and Human Services had served Naim

17          Makki with a request for patient records, I believe, because he

18          was listed at some point in the corporation documents as the

19          owner.  But in any event, they served Naim Makki and requested

20          records from New Millennium Pharmacy.  Naim Makki denied the

21          existence of those records.

22                    And yesterday, when the agents executed the search

23          warrant on Cherry Hill, they found the, what is referred to as

24          the OI-3, which is a Department of Health and Human Services

25          administrative subpoena, they found the very administrative

1    subpoena that had been served on Naim Makki for records that he

2    did not respond to, and they found it within the location where

3    all of the New Millennium records were located.  So I do take

4    at issue the suggestion that there hasn't been an attempt to

5    obstruct to some extent.  The Government --

6              THE COURT:  But that's by Naim Makki.

7              MR. ROSS:  By Naim Makki.

8              THE COURT:  Right.

9              MR. ROSS:  The brother who --

10             THE COURT:  Right.

11             MR. ROSS:  -- Pretrial Services is relying upon for

12   its information.  And it's at a business that the FBI conducted

13   surveillance on and saw Naim talking to Wahid Makki after Naim

14   Makki had been served with the OI-3.  The surveillance was the

15   reason that the agents were able to locate that site where the

16   search warrant was executed where they found all the records.

17             THE COURT:  That's what I'm trying to understand,

18   though.  Are you saying that Wahid Makki was served with a

19   request for records, denied that he knew where they were?  Or

20   are you only saying that happened with Naim Makki?

21             MR. ROSS:  That happened with the brother.  But the

22   location your Honor authorized the search warrant for yesterday

23   is, my understanding is owned by Wahid Makki.  And they were

24   seen together at that location subsequent to the agents serving

25   the OI-3 on Naim Makki.  The surveillance squad followed them

```
 1   to that location.  And that's, you know, they were told by Naim
 2   Makki that the records didn't exist.  And in fact, yesterday,
 3   we found two box trucks full of records.
 4          I would also note that the CMIR's, the Government is
 5   not saying that he failed in any way to comply with his duty.
 6   The only reason I bring up the CMIR's, it demonstrates this
 7   individual has substantial assets that are available to him and
 8   that he has taken out of the country.  There's nothing illegal
 9   with that.  Perfectly, perfectly legal to do that.  The only
10   reason we bring it up, again, is to point out that in addition
11   to the $1.7 million they've sent overseas to Lebanon, and
12   again, we've been provided with no documentation about this
13   alleged purchase in 2018 of real estate, or more recently.  So
14   I don't, I don't have any information about that, just suggests
15   that these defendants are the kind that would have the ability,
16   if they chose, to leave this country.  We believe they are a
17   serious risks of flight.  We believe they should both be
18   detained pending trial.
19          THE COURT:  Thank you.
20          MR. ROSS:  Thank you.
21      (Brief pause.)
22          THE COURT:  Let me just ask defense counsel some
23   questions.  There's reference to a child living in West
24   Virginia.  I haven't heard anything about that.
25          MR. SWOR:  That's Ali, your Honor.
```

```
1              THE COURT:  Okay.

2              MR. SWOR:  He's here.  He is in the process of

3   graduating from pharmaceutical school.  He is here visiting his

4   parents.

5              THE COURT:  Okay.  So three -- so we have three sons

6   that live in Michigan, one in West Virginia, and a daughter in

7   Boston?

8              MR. SWOR:  No.  We have --

9              THE COURT:  Two.

10             MR. SWOR:  -- two sons that live full-time in

11  Michigan.  We have a son who lives in West Virginia, but is

12  here in Michigan at the time, at the current time.

13             THE COURT:  Okay.  Got you.  All right.

14             And they currently live in Dearborn, but they own this

15  second home in, you said Commerce Township, Orchard Lake?

16             MR. SWOR:  Orchard Lake, yeah.

17             THE COURT:  I think it's Commerce Road in West

18  Bloomfield, accurately maybe.

19             MR. SWOR:  Zillow says it's Orchard Lake.

20             THE COURT:  Okay.

21             MR. SWOR:  It's in that gray area that is either West

22  Bloomfield, Orchard Lake, or Commerce Township, depending on

23  who you ask.

24             THE COURT:  Okay.  But --

25             UNIDENTIFIED SPEAKER:  (Unintelligible.)
```

```
 1              THE COURT:  Okay.  So they don't live in West
 2    Bloomfield, just sometimes they are there, otherwise it's
 3    vacant?
 4              MR. SWOR:  Yes.
 5              MR. RATAJ:  Your Honor, can I just clarifying one
 6    point regarding the son who is in pharmaceutical school in West
 7    Virginia --
 8              THE COURT:  Come closer to a microphone.
 9              MR. RATAJ:  Oh, I'm sorry.  He has finished
10    pharmaceutical school.  And now he is a full-time resident in
11    the state of Michigan.
12              THE COURT:  In the state of Michigan.
13              Okay.  Did you go to West Virginia University in
14    Morgantown?
15              UNIDENTIFIED SPEAKER:  No.  University of Charleston.
16              THE COURT:  Charleston, Okay.  I've spent a night
17    there.  Oddly enough, on the same trip I went to Charleston,
18    South Carolina, two very different places.
19              Let me see counsel at side bar, please.
20         (Side bar held off the record, 4:02 p.m. - 4:12 p.m.)
21              THE COURT:  Okay.  I'm going to address each of you
22    individually.  And first, I am going to start with Zeinab
23    Makki.
24              I have need to consider whether you should be released
25    on bond or whether you should be held in custody pending trial
```

1    under the Bail Reform Act.  Specifically I look at four factors

2    under that Act, which are set forth at Title 18 of the United

3    States Code, Section 3142(g).

4          And the first of those factors is the nature and

5    circumstances of the offense charged.  The offense charged is

6    health care fraud.  That is a serious offense.  It comes with

7    serious potential sentences, including incarceration for a

8    period of years should you be convicted or should you plead

9    guilty.

10         And the circumstances are -- the circumstances in this

11   case demonstrate that, from the proffer of the Government, that

12   this was done in multiple ways, not just in any one way, but in

13   a number of different manners, submitting claims for people who

14   are deceased, for medicines not disbursed, for people without

15   prescriptions for amounts that were not disbursed because they

16   were shorted, and for purposes of defrauding the Government.

17   So that is a serious matter.

18         Everything is relative to other things, right?  It's

19   not a violent crime.  It's not a crime where there is somebody

20   is going to lose their blood.  It's not -- there are other

21   kinds of health care fraud where it's alleged that people were

22   given addictive drugs, things like that, it's not one of those

23   type of health care crimes, health care fraud, but it's serious

24   nonetheless.  So I consider that first factor.  And the factor,

25   while it doesn't totally go against you, it largely does.  And

```
 1    for another reason, which is the prior history which involves
 2    civil penalty, and also that problems with the State of
 3    Michigan.  This is not the first time around the block on this
 4    kind of behavior.
 5           The second factor that I look at is the weight of the
 6    evidence, and it's the weight of the evidence as to both
 7    dangerousness and risk of non-appearance.  I don't see any much
 8    risk of dangerousness to the community.  There is economic
 9    harm, though, to society from the perpetuation of this type of
10    behavior.
11           But the real focus of today has been on risk of
12    non-appearance.  And there are ties to a foreign country.
13    There is money that's been sent to a foreign country which
14    would appear to include money from the ill-gotten gains here
15    towards building some property there.  You have ties in at
16    least one foreign country, that is Dubai, which is your sister.
17           But I also consider the things that will likely keep
18    you here.  And first and foremost, you have four children
19    living in the United States, two of them here, one about to
20    return here if he hasn't returned already, and a mother who has
21    Alzheimer's and is 80 years old and is not likely someone that
22    you're about to uproot.  And I also think that a mother's ties
23    are very -- your ties as a mother are strong.  And I don't see
24    you uprooting your entire family and leaving and going to
25    Lebanon for the rest of your life and being kept from your
```

1    children.  And I'm not hearing any evidence that they are about
2    to suddenly uproot themselves and go live in Lebanon.  And that
3    counts a lot, because I think the ties that you have here are
4    strong, and so I consider that.  So the second factor, I think,
5    is a mixed factor.

6          The third factor is the history and characteristics of
7    the person.  You do not have a prior criminal history.  You
8    have a high level of education.  You do have a history that
9    involves problems of this very nature, which according to the
10   Government's proffer, are ongoing, but there is no history of
11   you failing to appear in court or failing to do what you were
12   supposed to do when you did make -- enter into arrangements
13   with the Government, and so I consider that.  And also, as I've
14   already said, you have strong ties to this community and you
15   have your family here.  And I also consider the fact that
16   Pretrial Services has recommended bond.  Although, they don't
17   make the decision, I do, but I'm allowed to consider that
18   recommendation.  So I think the third factor largely goes in
19   your favor.

20         And then the fourth factor is dangerousness to the
21   community that would be posed by your release.  I'm not seeing
22   any particular danger to releasing you.  And so I find that the
23   factors weigh in favor of bond.

24         Pretrial Services has recommended that you report to
25   -- that you be released on a $10,000 unsecured bond.  And I'll

1    ask your husband to listen up, because I'm not going to repeat
2    some of these things.  That does not mean that you put up
3    $10,000, but it does mean that you would owe the Government
4    $10,000 if you violated your bond conditions.

5         But if you violate your bond conditions, you've got
6    other problems, one of which is that your bond could be revoked
7    and you'd be placed in custody until trial.  And I also think
8    you don't -- one of the things I consider about risk of fleeing
9    to Lebanon, as has been argued, is that while Lebanon may not
10   have an extradition treaty with the United States, essentially
11   any country you went to that did have an extradition treaty,
12   you could be arrested and you wouldn't be able to come back
13   here and see your children, which I think is unlikely.

14        I also note that you and your husband, and this goes
15   for him as well, repeatedly went back and forth to Lebanon, at
16   least on a yearly basis and came back every time, including at
17   a time when you knew that you were under investigation, at
18   least certainly had notice of the fact that you were.  So I
19   take all of that consideration.

20        The conditions will be that you have to report to
21   Pretrial Services as directed.  You have to surrender any
22   international travel documents you have, whether it be U.S.
23   passport, Lebanese passport, or enhanced driver's license and
24   not obtain any other.

25        I am not, in this case, going to allow any lag time

```
 1    for, if you have an enhanced driver's license, to hold onto it.
 2    It has to be turned over immediately if you have one and then
 3    you get a regular license.  I don't know if you have a license,
 4    but if that's not an issue, it's not an issue.
 5          Pretrial Services recommended your travel be
 6    restricted to Michigan.  I'm going to make it more
 7    circumscribed than that.  I am going to restrict your travel to
 8    the Eastern District of Michigan, which is roughly half of the
 9    Lower Peninsula.  You can't go to the Upper Peninsula at all.
10    You need to ask your attorney, Mr. Rataj and Pretrial Services
11    for advice about where the Eastern District of Michigan ends
12    and the Western District of Michigan begins, because they are
13    not very far away.  And if you go to Lansing, for example, you
14    would be out of this district and that would be a bond
15    violation.  And I also, I'm going to be issuing different
16    conditions for your husband in a moment.
17          But whose name is the property in that we've discussed
18    that has been put up as security in another case?
19          MR. SWOR:  Commerce Road is held jointly.
20          THE COURT:  Commerce Road is held jointly.  And?
21          MR. SWOR:  And the Howard Street property is held New
22    Millennium Investments LLC No. 3 of which Mr. Makki is the sole
23    member.
24          THE COURT:  It's New Millennium Investments, LLC?
25          MR. SWOR:  New Millennium Investments 3, LLC.
```

```
 1              THE COURT:  Okay.
 2              MR. SWOR:  Mr. Makki is the sole member of that LLC.
 3              THE COURT:  Okay.  I'm not going to require that Mrs.
 4   Makki put up any security.  I am convinced that Mrs. Makki is
 5   not going anywhere without Mr. Makki, but Mr. Makki, as I'm
 6   going to discuss in a moment, will be required to put up
 7   security in the form of property.  And so let me talk about
 8   that.
 9              MR. RATAJ:  Thank you, Judge.
10              THE COURT:  But, Mrs. Makki, did you understand the
11   conditions of your bond?
12              DEFENDANT ZEINAB MAKKI:  Yes, I do.
13              THE COURT:  Can you tell me that you'll comply with
14   them?
15              DEFENDANT ZEINAB MAKKI:  Yes, I will.
16              THE COURT:  All right.  Is there anything the
17   Government thinks needs to be added?
18              MR. ROSS:  Yes.  The United States would ask the Court
19   order the defendant not to be employed in any capacity in which
20   she would be billing Medicare, Medicaid, or any private health
21   care insurer, and that she not be on site at any such company
22   or organization that does the same.
23              THE COURT:  Let's hear from the defense on that.  That
24   is a common condition in these cases, and I have to say that in
25   light of the prior history, makes sense.
```

```
 1                  MR. RATAJ:  Well, but she has to work, Judge.  I mean,
 2     I can understand the condition that she not bill Medicare or
 3     Medicaid, but I mean, she has to work.  She still has to
 4     support herself and her family.
 5                  MR. ROSS:  As your Honor told the defendant
 6     previously, there are plenty of job opportunities that don't
 7     involve billing Medicare, Medicaid and Blue Cross.
 8                  THE COURT:  But what about in pharmacy?  I mean, is
 9     that possible in the pharmacy field?
10                  MR. ROSS:  No.  I mean, this defendant, again, her
11     history in this area is, is not without -- you know, it's not
12     beyond reproach.  She's run into difficulties with the
13     Controlled Substances Act.  She paid Medicaid $317,000 in 2014
14     for a pharmacy shortage, which is exactly the same type of
15     conduct for which she has been paid and benefitted to the tune
16     of $10.6 million.  So the Government's position is if she is
17     going to be released, that she not be permitted in any fashion
18     to work in a health care industry and not be involved in any
19     way in billing Medicare, Medicaid or any private health care
20     firm.
21                  THE COURT:  That seems broader.  Now you said not at
22     all in the health care industry, but before you said not
23     employed in billing Medicaid or Medicare or working in any
24     capacity that bills Medicaid or Medicare.
25                  MR. ROSS:  I think we would be satisfied if she is not
```

```
 1   billing Medicare, not billing Medicaid, or any private health
 2   care insurance company and not working at a pharmacy.
 3            MR. RATAJ:  Well, I mean, that's what she does, your
 4   Honor.  I mean, she's a pharmacist.  She's not accused of
 5   bilking Blue Cross Blue Shield or any private insurance
 6   company.  The allegations relate to Medicare.  So I think that,
 7   I mean --
 8            THE COURT:  Well, I mean, the taxpayers of this
 9   country aren't too thrilled about that.
10            MR. RATAJ:  You know, but she still is presumed to be
11   innocent, despite the Government's representations to the
12   Court.  And she has no criminal history.  And you can, quite
13   frankly, look at these past situations as an audit.  This
14   happens all the time.  Pharmacists are audited all the time.
15   That's all this was.  Okay.  I mean, this, this is one -- if it
16   was a crime, the Government would have made it a crime and
17   brought it as such, but these were nothing more than audits.
18            THE COURT:  How do I prevent her, the question would
19   be, how do I prevent her from, if she is working in a pharmacy
20   as a pharmacist, how do I prevent her from being involved in
21   billing?
22            MR. RATAJ:  Well, she, I mean, obviously she can't
23   bill Medicare.  She can't deal with any Medicare patients.  I
24   mean, you know, but she's got to be able to still make a
25   living.  This is the only thing that she knows.  This is how
```

```
 1   she helps support her family.

 2          MR. ROSS:  She admitted to being deliberately ignorant

 3   in 2011.  Defendants in this courthouse are convicted and serve

 4   jail time for being deliberately ignorant without violating the

 5   law.

 6          MR. RATAJ:  I don't know where that comes from, Judge.

 7          MR. ROSS:  It's right here in the settlement agreement

 8   that your client signed, Mr. Rataj.

 9          MR. RATAJ:  Well, this just got handed to me while we

10   were on the record, Counsel.  So I don't have -- you know,

11   forgive me for not reading --

12          THE COURT:  All right.  Let me just make a decision.

13   You guys, I don't really want you arguing across my courtroom.

14      (Brief pause.)

15          THE COURT:  I am going to order that she cannot be

16   involved in any capacity in billing Medicare, Medicare [sic] or

17   any insurer for pharmaceutical products, and that she may not

18   direct anyone else to do so.  The only thing she may do in the

19   capacity as a pharmacist is dispense medication.  If she's

20   involved at all in the billing process, if she's directing

21   other people about how to bill something, she'll be in trouble.

22   And I think it will be pretty easy to verify, quite frankly.

23          MR. RATAJ:  All right.  That's fine, Judge.  I mean --

24   okay.

25          MR. ROSS:  Your Honor?
```

```
 1              THE COURT:  Yes.
 2              MR. ROSS:  The way the system works, if she is working
 3   as a pharmacist, she is submitting the claim to the health
 4   insurance company and that's what causes the payment to be
 5   dispensed.
 6              THE COURT:  She's not going to be able to do that.
 7   She can't submit the claims.  She's going to have to find a
 8   workaround.  She can, she can work in a pharmacy where she
 9   measures out medicine, I suppose, and I don't know how else she
10   does it, but if there is not another pharmacist who can be
11   doing the billing or submitting the claim, she can't submit the
12   claims.  I agree with you about that.  But I also agree that
13   she has to be able to somehow work in some capacity.  So maybe
14   she works in a hospital and it's billed through them in their
15   pharmacy.  I don't know.  I'm trying to find a hybrid where
16   she's able to earn a living while presumed innocent, but at the
17   same time, has nothing to do with the billing process.  And if
18   that's not workable, then she can't do the work.
19              MR. RATAJ:  Well, let me ask this, Judge:  Can she
20   retain the services of a billing company to do the billing?  Or
21   we can get another pharmacist in there who could bill.
22              THE COURT:  I think what you need is another
23   pharmacist.
24              MR. RATAJ:  Okay.  All right.
25              THE COURT:  And you need a very honest one.
```

```
 1              MR. RATAJ:  Okay.  Fair enough.
 2              THE COURT:  Yes.
 3              MR. RATAJ:  Okay.  I just wanted to be clear so we
 4   don't run afoul of your Honor's order.
 5              THE COURT:  Okay.  So do you understand all of that,
 6   Mrs. Makki?
 7              DEFENDANT ZEINAB MAKKI:  Yes, I do.
 8              THE COURT:  All right.  Can you tell me, yes?
 9              DEFENDANT ZEINAB MAKKI:  Yes.
10              THE COURT:  All right.  Can you tell me you will abide
11   by all of that?
12              DEFENDANT ZEINAB MAKKI:  Yes, I will.
13              THE COURT:  All right.
14              MR. RATAJ:  Thank you, Judge.
15              THE COURT:  That will be your conditions.
16              MR. RATAJ:  Thank you.
17              THE COURT:  All right.  She's going to need to sign
18   now, because he's got to put up some property, so.
19              All right, Mr. Makki --
20              THE CLERK:  Yes.  Let's have Ms. Makki sign first.
21   Ms. Makki, don't -- just one a second.
22              THE COURT:  We want to have Pretrial let us know if
23   they have the bond ready.
24              THE CLERK:  Ms. Makki, go ahead and sign.  Okay.  I
25   have one more for you to sign but do not sign until I tell you
```

 1   to sign.

 2        (Brief pause.)

 3            THE COURT:  Mr. Williams, should I go ahead or do you

 4   want me to wait a second?

 5            THE CLERK:  Just wait one second, Judge.

 6        (Brief pause.)

 7            THE CLERK:  Ms. Makki, go ahead and sign.

 8            Okay.  Judge, we're ready.

 9            THE COURT:  Okay.  Mr. Makki, Mr. Swor, are you ready?

10            MR. SWOR:  Yes, your Honor.

11            THE COURT:  Okay.  Mr. Makki, I'm not going to repeat

12   everything I said because you heard me addressing your wife.

13   And although you're charged with different things, you are

14   charged with fraud, wire fraud and money laundering, and these

15   are very serious offenses.  You could be sentenced to a lengthy

16   sentence for each of those, as has been mentioned.  And you,

17   too, have had some prior awareness of this issue.  You're very

18   intertwined with the behavior that the proffer shows your wife

19   was involved in.  And so, but again, it's not a violent crime.

20   It's what people sometimes call a white collar crime.  It can

21   be very serious, but everything is relative in its seriousness.

22   But the evidence of the circumstances which is transfers of

23   money overseas is of concern to the Court.  So the first factor

24   goes against you largely, although, not entirely.

25            The second factor, which is the weight of the

```
 1    evidence, I don't see weight of the evidence as you being a
 2    danger, but I do see that there is some evidence of ties to a
 3    foreign country, to sending money to a foreign country.  But I
 4    also heard what Mr. Swor said and was persuaded that you didn't
 5    hide what the purpose of that money was for.  It said very
 6    clearly what the purpose of the money was for.
 7         I also noted that when there was travel overseas, you
 8    declared the cash, you and your wife declared the cash that was
 9    being brought overseas.  You didn't hide that either.
10         I also note that when you knew that you were under
11    investigation, or certainly should have known that you were
12    under investigation, that you came back from Lebanon; that your
13    trips to Lebanon had been quite regular and your returns have
14    been quite regular.
15         I also note that like your wife, you have significant
16    ties here in the United States and including to Michigan.  And
17    even though the non-extradition relationship between the United
18    States and Lebanon, the Government argues means you can flee
19    and don't come back, but it also means that were you to do
20    that, you would be cut off from your family potentially for the
21    rest of your life, unless they all wholesale move to Lebanon,
22    which I don't see any evidence is likely to happen.  And you
23    have a large family, both in terms of your siblings and in
24    terms of your children.  So obviously, when you have more than
25    three children, you have crossed the Rubicon.  That's when
```

```
 1    people take notice of you in a restaurant, and I can say that
 2    as someone who has seven children.
 3            So I think that there is, you know, there's concern on
 4    the Government's part, and I understand the concern, the Court
 5    has some concern, but I also think there's a lot of incentive
 6    for you to stay here, quite frankly.
 7            And I think the fact that you did report what the
 8    money was for and that it was, seems to be there's an
 9    explanation for it, there's also an explanation for why you
10    didn't report the property in Lebanon on your Pretrial report,
11    because apparently it's not titled in your name and the
12    Government has not shown me otherwise.  They have only shown me
13    that the money was sent for the purpose of building up that
14    property.  So I consider all of that.
15            And I don't think you're a danger to society, so the
16    fourth factor doesn't concern me.  You don't have a prior
17    criminal history, other than something I think very minor, if I
18    can find it.
19            MR. SWOR:  Retail fraud.
20            THE COURT:  Felony retail fraud, but it's back when
21    you were 35 years old.  I think you're beyond that and so I'm
22    not terribly concerned about that.  I don't see a history of
23    you failing to appear, even when you did have a prior criminal
24    issue.  And so I think that there are conditions that can
25    reasonably assure your appearance.
```

1            For you, the conditions are not the quite the same as

2    your wife, though, because I think you have been the one who

3    has had much more to do with the money and the transfer of the

4    money, and you have a bit more of a complicated business

5    situation where money could be laundered.

6            And so in your case, first of all, I am, it's going to

7    be a $10,000 unsecured bond, just like your wife, and I already

8    explained what that means.  You understand that your bond could

9    be revoked, you could be placed in custody.  You could be

10   prosecuted for violating bond conditions.

11           I am going to order that you be restricted to the

12   Eastern District of Michigan.  You may not leave the Eastern

13   District of Michigan for any purpose.  I am going to order that

14   you be subject to home detention and a tether.  You are --

15           MR. SWOR:  With -- I'm sorry.

16           THE COURT:  Excuse me.

17           MR. SWOR:  I'm sorry, your Honor.

18           THE COURT:  Go ahead, Mr. Swor.  You said he can work

19   from home.

20           MR. SWOR:  With discretion to the supervising officer?

21           THE COURT:  Yes.  I'll give discretion to the

22   supervising officer.

23           You are to turn in any document that would allow you

24   to engage in international travel, including an enhanced

25   driver's license.  That's to be done immediately.  I'm not

```
 1   going to wait for that to be converted into a regular license.
 2   You're going to have to figure that out and get a ride if you
 3   need it, but nothing that would allow you to leave the United
 4   States.
 5           And you are also, this is going to be, I'm going to
 6   ask the Government for a suggestion on the billing issue with
 7   -- he's not a pharmacist, so.
 8           MR. ROSS:  He's not a pharmacist.  I guess I was
 9   confused.  I thought, I thought there was going to be an
10   issuance of a secured bond.
11           THE COURT:  It is.  I haven't gotten to that yet.
12           MR. ROSS:  All right.
13           THE COURT:  I want to ask you about that issue, the
14   issue about his involvement in health care billing.
15           MR. ROSS:  I would ask the same condition attach.  I
16   don't know that he has any medical professional background
17   that --
18           MR. SWOR:  He doesn't, your Honor.
19           THE COURT:  Okay.  So that's an easy condition for
20   him.  So I'll impose a condition that he not be involved in any
21   billing for health care services or for insurance
22   reimbursement, Medicare or Medicaid or private.
23           MR. ROSS:  Thank you.
24           THE COURT:  And then there is going to be security.
25   And I am going to require, and this is going to need a sign-off
```

```
 1   by the presiding judge, who I believe is Judge Drain, and I
 2   don't know if that can be accomplished tonight or if he's going
 3   to have to wait a day, but he's going to have to put up the
 4   property on, it's the Howard Street property, I believe, which
 5   is in the name of -- it's in the name of the New Millennium
 6   Investment 3, I believe, LLC.
 7             MR. SWOR:  Correct.
 8             THE COURT:  And it's, right now, already been put up
 9   and is with the court in another matter, but it's going to be
10   released from that matter.  And so I'm going to ask the counsel
11   to work out the logistics of moving it from one matter to the
12   other.
13             Mr. Roth, [sic] you can do that?
14             MR. ROSS:  Yes.  That will also require the
15   involvement of Mohamad Makki's counsel, Mr. Collins, Jeff
16   Collins.
17             THE COURT:  Right.  So that's going to need to be,
18   that's going to need to be accomplished.
19             Let me just talk to Pretrial quickly.
20      (Brief pause.)
21             THE COURT:  So that's going to mean that we're
22   essentially calling this a continuance of the detention hearing
23   in his case.  He'll be kept in custody until we can get the
24   security put up.
25             MR. SWOR:  Yes.
```

```
 1              THE COURT:  Anything further on this matter, Mr. Roth?
 2              MR. ROSS:  Not from the Government.  Thank you.
 3              THE COURT:  Mr. Swor?
 4              MR. SWOR:  No, your Honor.
 5              THE COURT:  Okay.  Thank you.
 6          Thank you for everyone's patience.  This was
 7   complicated.  We had a couple of different matters going on
 8   here and it needed to be dealt with.  So he remains in the
 9   custody of the Marshals until the bond conditions can be met.
10              MR. SWOR:  Thank you, your Honor.
11              MR. ROSS:  Thank you, your Honor.
12              THE CLERK:  The preliminary exam for Zeinab Makki and
13   Wahid Makki will be April the 12th at 1:00.
14              MR. SWOR:  I would stipulate to an extension.  I'm
15   going to be Flint on the Flint water case.
16              THE COURT:  All right.  Work out a stipulated order,
17   please, with Mr. Roth.
18              MR. SWOR:  Yes, your Honor.
19              MR. ROSS:  If I just may, it's -- I'm Ross, R-O-S-S.
20              THE COURT:  Sorry.  I keep saying Roth.  And it
21   doesn't --
22              MR. ROSS:  I usually tell him it's a compliment.
23              THE COURT:  -- help with you in a mask.  Yeah, and I
24   did know that.
25              MR. ROSS:  Thank you.
```

```
 1              THE COURT:  But isn't there a Roth?

 2              MR. SWOR:  He was just here.

 3              THE COURT:  You're right.  No wonder I'm confused.

 4              MR. ROSS:  Judge Cleland does the same thing.

 5              THE CLERK:  It will appear on the docket as April the

 6    12th until we get a stipulated order.

 7              MR. SWOR:  Very good.

 8              THE COURT:  All right.  Pretrial has something to say?

 9              PRETRIAL SERVICES OFFICER:  Your Honor, also we would

10    like, since the defendant is getting released on bond, we would

11    ask other conditions, to reside at the bond address and not

12    make any change in residence unless pre-approved; that he

13    possess -- not possess any weapons and remove all firearms from

14    the house and provide verification of the same; and surrender

15    any concealed pistol license he has to Pretrial Services.

16              THE COURT:  Yes, that is going to be required.

17              MR. SWOR:  That's --

18              THE COURT:  Yes.  Thank you.

19              MR. SWOR:  Yes.  I was going to bring it up.

20              THE COURT:  Yes.  Okay.  Thank you.

21              MR. SWOR:  Does the Government have his ID?

22              MR. ROSS:  I will double check with the agents.  I

23    don't believe so.  I know they didn't take the passports,

24    because I did ask specifically about that.

25              MR. SWOR:  Well, they didn't take the Lebanese
```

```
 1   passports.
 2            THE COURT:  And we need that.
 3            MR. SWOR:  We'll find them.
 4            THE COURT:  Yes.
 5            MR. SWOR:  Okay.
 6            MR. ROSS:  I think he has an enhanced driver's
 7   license, as I recall.
 8            MR. SWOR:  He does.
 9            THE COURT:  He does?
10            MR. SWOR:  He does.  We'll just, that will stay
11   surrendered with the Court and he won't replace it with a --
12   he'll replace it with a standard.
13            THE COURT:  Okay.  Anything further on this matter?
14            MR. ROSS:  No, your Honor.  Thank you.
15            THE COURT:  Mr. Swor?
16            MR. SWOR:  Just call Judge Cox and tell him I'm on my
17   way.
18            THE COURT:  Oh, is it Judge Cox?  I thought it was
19   Judge Drain.
20            MR. SWOR:  No.  No.
21            THE COURT:  Oh, okay.
22            MR. SWOR:  Thank you.
23            THE COURT:  All right.  You're welcome.
24       (Matter concluded, 4:45 p.m.)
25                  *          *          *
```

1

2                      **CERTIFICATE OF REPORTER**

3

4          I certify that the foregoing is a correct transcript

5    from audio recorded proceedings in the above-entitled cause on

6    the date hereinbefore set forth.

7

8

9                     s/ Christin E. Russell

10             CHRISTIN E. RUSSELL, FCRR, RDR, CRR, CSR-5607

11                   Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25